IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JAMES MILTON SMITH, JR.,
    Plaintiff,

vs.                                                 Case No.: 5:14cv127/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,
    Defendant.
_____/

**MEMORANDUM DECISION AND ORDER**

        This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 8, 9). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

        Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.

I.        PROCEDURAL HISTORY

        On January 21, 2011, Plaintiff filed applications for DIB and SSI, and in each application he alleged disability beginning December 12, 2010 (tr. 38, 210).[1] His applications were denied initially on March 4, 2011 (tr. 98–99), and on reconsideration on April 6, 2011 (tr. 108–09), and

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on August 29, 2014 (doc. 14), and the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

thereafter he requested a hearing before an administrative law judge ("ALJ"). A hearing was held on October 5, 2012, and on November 1, 2012, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 38–47). The Appeals Council subsequently denied Plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

II.     FINDINGS OF THE ALJ

In denying Plaintiff's claims, the ALJ made the following relevant findings (*see* tr. 38–47):

(a)     Plaintiff meets the insured requirements of the Act through December 31, 2015[2];

(b)     Plaintiff did not engage in substantial gainful activity ("SGA") after December 12, 2010, the alleged disability onset date[3];

(c)     Plaintiff has four severe impairments: cervical degenerative disc disease ("DDD"), lumbar DDD, diabetes mellitus, and obesity;

(d)     Plaintiff has no impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(e)     Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). He can frequently lift ten pounds and occasionally lift twenty pounds; stand or walk for six hours and sit for six hours in an eight-hour workday; occasionally climb ladders, ropes, or scaffolds, and balance, stoop, and crouch; frequently climb, kneel, and crawl; and he should avoid concentrated exposure to hazards;

(f)     Plaintiff is unable to perform any past relevant work;

---

[2] The time frame relevant to Plaintiff's claim for DIB is December 12, 2010 (date of alleged onset), through November 1, 2012 (date of the ALJ's decision), even though Plaintiff is insured for DIB purposes beyond the date of the ALJ's decision. The court notes that the ALJ appears to have made a scrivener's or other error in stating that Plaintiff is insured for DIB purposes through the end of 2015, instead of the end of March 2016 (*compare* tr. 56 *with* tr. 38), but to the extent the ALJ erred the error is of no consequence because the relevant period of adjudication ended on the date of the ALJ's decision.

The time frame relevant to Plaintiff's claim for SSI is January 21, 2011 (date of SSI application), through November 1, 2012. *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which he is both disabled and has an SSI application on file).

[3] There is a suggestion in the record that Plaintiff amended—or intended to amend—his disability onset date during his administrative hearing, to December 19, 2011 (Plaintiff's 50th birthday) (*see* tr. 329; *see also* doc. 22 at 2 n.1), but the ALJ did not so find (*see* tr. 38). As this court's review is limited to determining whether the ALJ's decision is supported by substantial evidence from the record and was a result of the application of proper legal standards, the court will review the ALJ's decision as including a finding that Plaintiff alleged disability beginning on December 12, 2010.

(g) Plaintiff was born on December 19, 1961, and thus was forty-eight years old, which is defined as a younger individual aged 18–49, on the alleged disability onset date; his age category subsequently changed to "closely approaching advanced age";

(h) Plaintiff has at least a high school education and is able to communicate in English;

(i) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules ("the Grids") as a framework supports a finding that Plaintiff is "not disabled," regardless of whether he has transferable job skills;

(j) In light of Plaintiff's age, education, work experience, and RFC, there are jobs existing in significant numbers in the national economy that Plaintiff can perform; therefore, Plaintiff has not been under a disability, as defined in the Act, from December 12, 2010, through the date of the decision.

III. STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence

preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any [SGA] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A). Pursuant to 20 C.F.R. § 404.1520(a)–(g),[4] the Commissioner analyzes a disability claim in five steps:

    1.     If the claimant is performing SGA, he is not disabled.

    2.     If the claimant is not performing SGA, his impairments must be severe before he can be found disabled.

    3.     If the claimant is not performing SGA and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

    4.     If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

    5.     Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must

---

[4] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (see 20 C.F.R. §§ 404, 416). Therefore, citations in this Order should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    SUMMARY OF RELEVANT EVIDENCE OF RECORD

    A.    Plaintiff's Personal History, Hearing Testimony, and Other Statements

As indicated above, Plaintiff was forty-eight years of age on December 12, 2010, the date he alleges he became disabled, though he attained the age of forty-nine one week later; he was fifty on November 1, 2012, the date of the ALJ's opinion. Plaintiff completed the twelfth grade (tr. 60).

Though Plaintiff's earnings records show income in all four quarters of 2011 (*see, e.g.*, tr. 218, 225, 228–29, 234, 235), Plaintiff testified at his administrative hearing, held October 5, 2012, that he did not recall working in 2011, that the 2011 income shown on his earnings records might have been unemployment compensation, and that, to the best of his recollection, he last worked in the fourth quarter of 2010 (tr. 61–62; *see also* tr. 40, 287). During the fourth quarter of 2010 Plaintiff worked as a maintenance man and performed indoor and outdoor work involving grounds keeping, moving furniture, buffing floors, and "sometimes" lifting objects that weighed fifty pounds (tr. 62–63). Plaintiff's work prior to the maintenance job involved loading trucks, bagging and stacking fifty-five pound bags, maintaining hospitals, remodeling, painting, hanging drywall, metal framing, operating equipment, and working as a fireman (tr. 64–66, 82). Plaintiff stated he quit working due to having two pancreatic attacks in 2010 and his becoming a "full blown diabetic" after the attacks, as well as the medications he takes and his inability to go out in the sun "without falling out" (tr. 66–67). He testified that he "just sit[s] at the house" during the day due to his inability to be in the heat, which can cause dizzy spells and, apparently, fainting (tr. 67, 88). Plaintiff stated he administers three insulin shots daily and monitors his blood sugar, but his diabetes is nevertheless not under control (tr. 67–68).

Plaintiff also complained of pain and other problems with his lower back and noted that he last had a magnetic resonance imaging ("MRI") in 2004, which is when his back pain began though it has worsened over time (tr. 69, 84; *see also* tr. 452 (MRI report, dated July 6, 2004)). He reported that the left side of his body becomes numb, including his hand and at times his knee, and the left side of his body feels colder than the right side (tr. 69–70, 77). He was prescribed "nerve medicine" for this condition, but the medication "didn't seem to help much" (tr. 70). The numbness causes

Plaintiff to drop things because he cannot feel them in his left hand (*id*.)). He also has neck pain, a bad knee on the left side, and "poor circulation [from the knee] down into [his] feet" (*see id*., 77–78; *see also* tr. 462).

Plaintiff noted that he was receiving mental health treatment from Michael Barnes, M.D., who prescribes Zoloft for depression, and mental health counseling on a monthly basis from "Mrs. Jones" at "Life Management," though he skipped the month prior to his hearing because he did not feel well (tr. 72–73). Plaintiff testified that the Zoloft "help[s]" him, "mellows [him] out," prevents him from arguing with his wife, and has reduced or eliminated the irritation he felt "a lot" prior to taking Zoloft (*see* tr. 73). He stated that he does not go out in public very often but could not explain why other than to note that he "just don't care to be around nobody" (tr. 75).

Plaintiff stated he is able to cook, wash dishes, mop, dust, and vacuum, but he "can only do so much" (*id*.). He can sit for about twenty to thirty minutes and then must stand (tr. 84). He has difficulty standing and walking due to poor circulation and painful and "burning" toes, which conditions are reportedly a result of his diabetic condition (tr. 85–86). He noted that the toe pain resolves once he administers an insulin shot (tr. 86). Lastly, Plaintiff stated he was "pretty sure" he could not stand six hours in an eight-hour workday (*id*.).

   B.  Relevant Medical History

Between 2009 and 2013 Plaintiff received treatment from Dr. Barnes, a family practitioner, for a variety of conditions including back pain, insomnia with muscle spasms, dyslipidemia, anxiety, depression, and pancreatitis, for which Dr. Barnes prescribed a variety of medications including cyclobenzaprine, Xanax, Lortab, Lopid, and Lipitor (*see, e.g.*, tr. 13, 400, 416). In a treatment note from January 2009 Dr. Barnes noted Plaintiff's report that he had been taking his medications as directed and was "doing fairly well" (tr. 416). He also noted that Plaintiff's physical examination was normal and that Plaintiff exhibited no mental abnormalities (*id*.). A follow-up treatment note from April 2009 is nearly identical (tr. 414). A January 2010 treatment note reflects that Plaintiff reported abdominal pain and that a physical examination revealed some pain near the gallbladder, but otherwise the note is largely the same as Dr. Barnes' earlier treatment notes (tr. 412). On April 13, 2010, Dr. Barnes indicated that he would order gallbladder studies in light of Plaintiff's

continued complaints of abdominal pain and pain upon examination (tr. 410).  It was also noted that Plaintiff was using his Xanax "just to sleep at night" (*id.*).

On April 30, 2010, Plaintiff presented to an emergency room ("ER") with complaints of severe abdominal pain (tr. 367).  The ER records state that Plaintiff is "known to have type 2 diabetes and he is noncompliant with medications" (tr. 368).  Plaintiff was assessed with acute pancreatitis and admitted for observation and care (tr. 367–68).  Plaintiff underwent a surgical procedure to remove his gallbladder, after which he reported doing fine, as he did upon his discharge on May 7, 2010 (*see* tr. 363).  Plaintiff was "given sick leave until . . . Tuesday," May 11, 2010, at which time he was to see Dr. Barnes (*id.*).

On May 11, 2010, Dr. Barnes saw Plaintiff and wrote in his treatment note that Plaintiff's gallbladder disease had "resulted in pancreatitis and his insulin and blood sugar got all out of whack," but that Plaintiff was now "doing fine" and taking his medications as directed, though his "blood sugar [was] still running high" (tr. 408).  A treatment record from June 2010 is largely unremarkable, other than noting Plaintiff's seemingly unrealistic fears about some redness at the base of his left thumb, which Plaintiff thought could ultimately lead to an amputation, but which Dr. Barnes viewed as non-worrisome and requiring only an antibiotic (tr. 406).

Plaintiff presented to the Gulf Coast Medical Center on September 8, 2010, with complaints of abdominal pain (tr. 375).  He was assessed with acute pancreatitis secondary to severe hypertriglyceridemia and also was noted to be noncompliant with treatment for obesity, diabetes, and hyperlipidemia (*id.*).  The attending physician created a treatment plan that included placing Plaintiff on a "very aggressive, low-calorie, low-fat diet, monitoring his cholesterol profile and blood sugars" (*id.*).  The physician also noted that he "counseled [Plaintiff] thoroughly about [adhering to a] very low fat diet," exercising, and avoiding certain foods that he had regularly consumed, including steaks, other red meats, ham, heavy food, and desserts and "all kinds of sweets" (tr. 374–75, 379).  Plaintiff's wife was also advised that Plaintiff needed to diet, exercise, lose weight, and monitor his cholesterol profile, weight, and blood sugars (tr. 378).  Another physician noted that Plaintiff was "obviously" in need of diabetic counseling (tr. 377).

Dr. Barnes' treatment note as to a visit with Plaintiff on September 15, 2010, reflects that Plaintiff had recently been hospitalized for "pancreatitis with triglycerides of around 5000" (tr. 404).

Dr. Barnes stated that "[h]opefully his blood sugar will calm down and we can stop his insulin as soon as his pancreas calms down and regains function" (*id*.).  In October 2010 Plaintiff's blood sugar was still high, and Dr. Barnes adjusted his medications (*see* tr. 402).  He also advised Plaintiff to return for follow-up in about two months, or in or about December 2010.

On February 25, 2011, Dr. Barnes completed a questionnaire that asked, "Do you feel that [Plaintiff] suffers from a mental impairment that significantly interferes with daily functioning?"  In response, Dr. Barnes marked "NO." (tr. 423).

It appears that Plaintiff next saw Dr. Barnes, on June 28, 2011[5] (tr. 462).  Plaintiff reported neck pain, shoulder pain, numbness in his left hand, and burning in his feet (*id*.).  He stated he had not been taking his insulin shots regularly and was "out of" his other medications (*id*.).  He further stated that he only checked his blood sugar when his feet burned, and Dr. Barnes reminded Plaintiff that he was supposed to check his blood sugar daily (tr. 462–63).  Plaintiff also reported that "[t]hings ha[d] been so bad mentally" and that he was irritable, down, and worried (tr. 463).  Dr. Barnes thus increased Plaintiff's Celexa dosage to 40 mg (*id*.).[6]  Dr. Barnes assessed peripheral neuropathy, back pain, generalized anxiety disorder, diabetes, depression, dyslipidemia, hypertension, insomnia with muscle spasms, and pancreatitis (tr. 462).  A physical examination was unremarkable (tr. 462).  Dr. Barnes opined that Plaintiff had medial carpal tunnel syndrome "or at least a nerve impingement syndrome on his left upper extremity" and that Plaintiff would have to follow up with an orthopedic physician and obtain an MRI (*id*.).  In October 2011, Plaintiff reported to Dr. Barnes that he had "been doing fairly well" (tr. 459).  He also stated he had been cutting back some on his insulin and had apparently not been taking his triglyceride medication (*see id*.).  A physical examination was again unremarkable (*id*.).  Plaintiff made no mention of depression or anxiety, though he was again diagnosed with both conditions.  Plaintiff next returned to Dr. Barnes in February 2012.  Plaintiff reported some burning down his left arm, for which Dr. Barnes prescribed Neurontin (tr. 457).  Dr. Barnes also noted the following in his treatment record:

---

[5] Although a treatment record exists in the file from Dr. Barnes that is dated January 5, 20**11**, it appears that the record pertains to a visit with Plaintiff on January 5, 20**12**, as the record includes notations stating that Plaintiff began taking on Zoloft on May 17, 2012, and discontinued taking Celexa the same day (*see* tr. 461).

[6] The undersigned was unable to locate a record establishing when Plaintiff was first prescribed Celexa or the dosage when it was first prescribed.  As noted, Plaintiff saw Dr. Barnes in October 2010, but the treatment record from that visit does not show that Plaintiff was prescribed Celexa (*see* tr. 402–03).  The next chronological record appears to be dated June 28, 2011, and it indicates that both Plaintiff and his wife reported that "the Celexa is just not working" and that Dr. Barnes thus "increase[d] his Celexa to 40 mg a day" (tr. 463).

"Depression — This is [Plaintiff's] biggest problem. He's really reluctant to take his antidepressant, but he needs to be on an antidepressant more than anything. His whole life situation has just got him up against the wall." (*id*.). Dr. Barnes prescribed Zoloft, 100 mg, once per day (*id*.). Another treatment record from Dr. Barnes, dated in May 2012, again notes that depression is Plaintiff's biggest problem and, according to Dr. Barnes, it was "getting worse and worse I'm afraid," though Plaintiff denied any suicidal or homicidal ideation, and he was alert and aware in all three spheres (tr. 453). Dr. Barnes continued Plaintiff on Zoloft, 100 mg, once per day (*id*.).

On July 11, 2012, Plaintiff presented to the Life Management Center ("LMC") for an evaluation and to initiate mental health treatment, upon Dr. Barnes' referral (tr. 468). Plaintiff reported anxiety and depression and stated that the depression began approximately two years prior, around the time he began having medical and financial problems (*id*.). He reported "low mood, anhedonia, poor sleep, appetite problems, feeling like a failure, poor concentration . . . [and] feeling anxious, overwhelmed, and irritable" (*id*.). Additionally, although Plaintiff stated he had no suicidal thoughts or plans, he also stated he would be "better off dead" (*id*.). He noted he had "financial stressors and [was] hoping to get disability" (*id*.). An evaluation revealed that Plaintiff was oriented as to person, place, situation, and time (tr. 467). Plaintiff exhibited appropriate mood, affect, thought processes, and intellect, as well as normal thought content and "fair" (not "good" or "poor") insight and judgment (*id*.). Omar H. Howard, M.D., a psychiatrist, assessed major depressive disorder, recurrent moderate, and generalized anxiety disorder; he estimated Plaintiff's Global Assessment of Functioning ("GAF") to be 51[7] (tr. 469). Plaintiff's medications were adjusted, he was referred for counseling, and he was advised to return to the LMC in one month (*id*.). Plaintiff returned to the LMC on or about August 8, 2012, and reported a slight improvement in mood but also reported "several days of low interest, feeling low, frequent poor sleep, frequent low energy, frequent poor concentration, . . . [and] occasional thoughts of being better of [sic] dead," though he

---

[7] GAF is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994). It may be expressed as a numerical score. *Id.* at 32. A score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

again denied any suicidal thoughts or plans (tr. 465). Dr. Howard's mental health evaluation yielded the same results as before, and he assessed the same diagnoses and GAF score (tr. 464–65).

On October 16, 2012, shortly after Plaintiff's hearing before the ALJ, Plaintiff obtained an MRI of the cervical spine (tr. 482). It showed a moderately sized posterior disc protrusion at C3-4, moderate DDD at C5-6 and to a lesser degree at C4-5, and inconsequential abnormalities at other levels of the cervical spine (*see id.*).

C.  Other Information Within Plaintiff's Claim File

On March 4, 2011, Janis Heffron, Ed.D., a psychologist, completed a "psychiatric review technique" form "PRTF") for the Social Security Administration ("SSA"), in connection with Plaintiff's request for reconsideration of the initial denial of her claims for benefits (*see* tr. 424–36; *see also* doc. 22 at 5 & n.6). She evaluated Plaintiff's conditions under Sections (or "Listings") 12.04 and 12.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (Affective Disorders and Anxiety-Related Disorders, respectively) (tr. 424, 427, 429). She concluded that Plaintiff's depression and anxiety were non-severe and did not satisfy the diagnostic criteria necessary to qualify as disabled under the Listings (tr. 424, 426, 429). In so concluding, Dr. Heffron noted—in pertinent part—that although Dr. Barnes assessed anxiety in October 2010, Plaintiff's blood sugar was high at that time, and that Dr. Barnes subsequently noted that Plaintiff had no mental impairment that significantly interfered with daily functioning (tr. 436). She also concluded that Plaintiff's conditions caused no restriction of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation (tr. 434). On March 28, 2011, John Thibodeau, Ph.D., also with the SSA, reviewed all of the evidence in Plaintiff's claims file and Dr. Heffron's findings; he then affirmed her "PRTF . . . as written" (tr. 440).

In early March 2011, Brigida Tellis, an adjudicator with Disability Determination Services ("DDS"), completed a physical RFC assessment form, on which she concluded that Plaintiff was capable of performing work that is generally consistent with the definition of "medium" work (*see* tr. 100–07; 20 C.F.R. § 404.1567(c)). On March 29, 2011, Nicolas Bancks, M.D., a non-examining DDS physician, also completed a physical RFC assessment form. Dr. Bancks opined that Plaintiff

could perform light work with the same restrictions the ALJ (later) incorporated into Plaintiff's RFC (*compare* tr. 441–48 *with* tr. 42, ¶5).

Robert N. Strader, a vocational expert ("VE"), testified at Plaintiff's administrative hearing (tr. 89; *see also* tr. 167–68). Mr. Strader identified Plaintiff's past work as a maintenance engineer as "medium," with a specific vocational preparation ("SVP") of 3, and his work loading trucks as "medium to heavy" and unskilled with a SVP of 2 (tr. 90–91). He then opined that a hypothetical person with Plaintiff's RFC could not perform that work (tr. 90). The person could, however, perform other available work, including work as a hand packer (SVP 1), assembler (SVP 2), and cafeteria attendant (SVP 2), all of which jobs are both "light" and unskilled (*see* tr. 91). According to the VE, if the hypothetical individual could sit six hours and stand two hours during an eight-hour workday, there definitely "would[] be a lot of sedentary jobs" the person could perform, including sedentary assembler and sedentary hand packer, both of which are unskilled with a SVP of 2 (tr. 92).

        D.        Evidence Submitted to the Appeals Council

Plaintiff presented additional evidence to the Appeals Council ("AC"), including treatment records from The NeuroPain Center, dated between on January 23, 2013, and March 12, 2013 (tr. 17–30). Included within The NeuroPain Center's records are the results of a lumbar spine MRI (tr. 23) and electromyogram and nerve conduction velocity studies conducted in February 2013 (tr. 23–24).

Plaintiff also supplied additional treatment records from Dr. Barnes, dated March 12, 2013, and May 21, 2013 (tr. 12–15). The March records note that Plaintiff was "doing fairly well" with respect to his diabetes, but Dr. Barnes stated that Plaintiff was "severely" depressed and "not doing well from [that] standpoint," though Plaintiff denied any suicidal or homicidal ideations (tr. 15). Dr. Barnes increased Plaintiff's Zoloft to 200 mg and stated that if Plaintiff did "not do[] much better," he would prefer that Plaintiff see a psychiatrist (*id*.). In May 2013, Dr. Barnes noted that Plaintiff's was "really not getting much better" and stated that although Plaintiff continued to deny any suicidal or homicidal ideations, "[w]e are going to have to get him in to a psychiatrist" (tr. 13).

V.        DISCUSSION

Plaintiff contends the ALJ erred in determining that he had no severe mental impairment (doc. 22 at 13–18), in failing to properly account for Plaintiff's spinal condition and neuropathy in

Page 12 of 20

the RFC (*id*. at 19–21), and in making his credibility findings (*id*. at 21–24). The court will address the first of Plaintiff's claims, after addressing the alleged onset date issue (*see* footnote 3, *supra*), even though Plaintiff has not specifically raised the onset date as an issue in this appeal.

    A.    Disability Onset Date

In applying for benefits, Plaintiff clearly and specifically alleged a disability onset date of December 12, 2010 (tr. 210; *see also* tr. 56, 62, 237 (additional references to same onset date)). Though Plaintiff's former counsel asserted in seeking review by the AC that Plaintiff amended his onset date to December 19, 2011 (*see* tr. 329), his counsel on this appeal concedes that Plaintiff "did not specifically amend his onset date during the hearing, rather possibility [sic] of such was implied" (doc. 22 at 2 n.1). A review of the transcript of Plaintiff's hearing before the ALJ reveals that Plaintiff's former counsel confirmed with the ALJ at the outset of Plaintiff's hearing that Plaintiff's alleged onset date was December 12, 2010 (tr. 56). And the only other statement made by counsel that remotely touches on the onset date is the following:

> Based on Mr. Strader's assessment [presumably his conclusion that Plaintiff had no transferable job skills], it would seem to me that we would be considering a grid rule at [age] 50, or within the six month latitude that is permitted since he could — there were no transferable skills. And you know, assuming [Plaintiff] was limited to sedentary work . . . .

(tr. 94; *see also* tr. 93). These statements did not alert the ALJ to a change in Plaintiff's onset date. Moreover, even if Plaintiff would have been disabled at age 50 under the Grids due to no transferable job skills and an RFC for <u>sedentary</u> work, as Plaintiff seems to have contended at his hearing, the ALJ concluded that Plaintiff could perform <u>light</u> work, which does not render him disabled under the Grids at age 50. *See* 20 C.F.R., Part 404, Subpart P, Appendix 2, Table 1, § 201.12 (for sedentary work) and Table 2, § 202.13 (for light work); *see also* 20 C.F.R. § 404.1563(d) (defining a person in the "closely approaching advanced age" category as one aged 50–54).

To the extent Plaintiff actually intended to amend his onset date during the hearing, he or his counsel had an obligation to definitively so state. But neither did. The undersigned thus finds no error with respect to the ALJ's finding that Plaintiff alleged disability as of December 12, 2010, or,

correspondingly, no error with respect to the ALJ's conclusions as to Plaintiff's age categories during the period under adjudication or his use of the Grids as a framework for his decision.

B.   Mental Impairments

The ALJ concluded that Plaintiff's depression and anxiety were medically determinable mental impairments, but they were not severe impairments. More specifically, the ALJ found that the two conditions, "considered singly and in combination, do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and are, therefore, nonsevere" (tr. 41). Plaintiff contends the ALJ erred at step two in finding his depression and anxiety non-severe.

At step two of the sequential evaluation process, a claimant must prove that he is suffering from a severe impairment or combination of impairments, that have lasted (or must be expected to last) for a continuous period of at least twelve months,[8] and which significantly limit his physical or mental ability to perform "basic work activities." *See* 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii) & (c), 404.1520a. Basic work activities include physical functions not at issue here, and mental functions such as understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1520a. An impairment can be considered non-severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984); *see also* Bowen v. Yuckert, 482 U.S. 137, 153 (1987) ("The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education and experience were taken into account"). Although the claimant carries the burden at step two, the burden is mild. McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) ( "Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be

---

[8] The need for an impairment to have lasted, or be expected to last, for a continuous period of at least twelve months is known as the "duration requirement."

rejected."). A claimant need only show that his "impairment is not so slight and its effect is not so minimal." *Id.*

Here, in finding Plaintiff's mental impairments non-severe at step two, the ALJ relied upon the following evidence and/or made the following statements with respect to Dr. Barnes:

(1) although Dr. Barnes prescribed medications for Plaintiff's mental impairments, he noted no psychiatric abnormalities, and he assessed no mental functional limitations at any time during the course of Plaintiff's treatment;

(2) on February 25, 2011, Dr. Barnes specifically opined that Plaintiff did not suffer from a mental impairment that significantly interfered with daily functioning;

(3) Dr. Barnes' opinion of February 25, 2011—that Plaintiff did not suffer from a mental impairment that significantly interfered with daily functioning—is "consistent with the overall record"; and

(4) although Dr. Barnes noted in February and May of 2012 that Plaintiff's "biggest problem" was depression:

(a) Dr. Barnes did not explain the apparent contradiction between these opinions and the opinion he rendered in February 2011, and the ALJ characterized the February 2012 opinion as "sudden" and unexplained,

(b) Plaintiff had "normal psychiatric examination[s]" in February and May 2012, which examinations are inconsistent with Dr. Barnes' statements at those times that depression was Plaintiff's biggest problem, and

(c) Dr. Barnes assessed no mental limitations in February or May 2012, despite commenting that Plaintiff's depression was a big problem (*see* tr. 41).

Continuing, with respect to other evidence of record, the ALJ found that:

(1) the opinions of Dr. Thibodeau and Dr. Heffron—namely, that Plaintiff had no severe mental impairment, no restriction of activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation—are "most consistent with the longitudinal evidence, which shows no formal psychiatric treatment from a mental health specialist until July 11, 2012" (or, less than four months prior to November 1, 2012, the end of the time frame relevant to this appeal); likewise, Plaintiff's ability to perform a wide array of activities of daily living is consistent with a finding that he has no restriction of activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation;

(2) Dr. Howard's examination of Plaintiff on July 11, 2012, yielded essentially normal results, and thus the GAF score he assessed is seemingly inconsistent with his examination; Dr. Howard's record from Plaintiff's follow-up visit in August 2012 included a notation that Plaintiff's mood was slightly improved and reflected that there had been "no significant change in mental status examination aside from dysphoric mood," but Dr. Howard assessed the same diagnoses and GAF

score; and, even if Dr. Howard's GAF score is accepted, it was assessed over a one-month period near the end of the relevant period, and thus Plaintiff's mental impairments do not satisfy the duration requirement; and

(3) Plaintiff "only recently received mental health treatment, and these [LMC] treatment records do not relate back to his alleged onset date" (tr. 41–42).

The undersigned cannot confidently conclude that substantial evidence supports the ALJ's findings at step two and thus cannot affirm his overall finding that Plaintiff had no severe mental impairment or any functional limitations resulting from his depression or anxiety.

With respect to Dr. Barnes, although many of the ALJ's findings accurately reflect or track the evidence of record, the findings generally fail to account for the evidence from Dr. Barnes that shows a worsening of Plaintiff's depression over time. Importantly, Dr. Barnes' records from 2012 reflect—not only Plaintiff's complaints, but also Dr. Barnes' view—that Plaintiff was experiencing increased and significant depression. Although Dr. Barnes is not a mental health specialist, he treated Plaintiff for many years and had the opportunity to interact with him and observe him on a fairly regular basis during the course of his treatment, and he clearly believed that Plaintiff's depression was progressively worsening. As noted above, Dr. Barnes started Plaintiff on Celexa (apparently some time prior to June 2011 (*see* footnotes 5, 6, *supra*)), without success; he increased Plaintiff's Celexa dosage in June 2011, without success; in February 2012 he switched Plaintiff to Zoloft, 100 mg, once a day, without success; and he switched Plaintiff to Zoloft, 200 mg, in March 2013, but he noted in May 2013—that even with the largest dosage of Zoloft that Plaintiff had tried to date—Plaintiff's depression was "really not getting much better" and psychiatric care was necessary. He also referred Plaintiff to the LMC for specialized psychiatric care.

The ALJ additionally noted that in February 2011 Dr. Barnes stated that "[Plaintiff] does not suffer from a mental impairment that significantly interferes with daily functioning," but in February and May 2012 "Dr. Barnes *suddenly* opined that [Plaintiff's] biggest problem is depression" (tr. 41) (emphasis added). The undersigned does not find Dr. Barnes' opinion of February 2012 to be "sudden." The opinion was offered one year after his earlier opinion, and it followed Plaintiff's June 2011 visit, during which Plaintiff reported that things had "been so bad mentally," and Dr. Barnes increased the Celexa dosage after determining that the current dosage was ineffective. As noted *supra*, the ALJ further determined that Dr. Barnes' opinion of February 2011 should be "credit[ed]

. . . because it is more consistent with the overall record" (tr. 41). This determination is likewise not supported by the record as a whole, because it fails to account for the more recent evidence from Dr. Barnes (and from the LMC, as discussed more fully *infra*). Lastly, the ALJ found that Dr. Barnes conducted normal psychiatric examinations in February and May 2012, and thus his contemporaneous opinions that Plaintiff was significantly depressed are inconsistent with the results of the examinations. Dr. Barnes' treatment records from February and May 2012, however, show only that he determined Plaintiff was "[a]lert and aware in all three spheres," not that he conducted thorough psychiatric examinations that resulted in normal findings (*see* tr. 457, 453). Additionally, one can be oriented as to person, place, and time yet still exhibit symptoms of depression or even severe depression.[9]

Continuing, in finding Plaintiff's mental impairments non-severe, the ALJ pointed to the opinions of the non-examining SSA psychologists (tr. 41). Dr. Thibodeau and Dr. Heffron, however, rendered their opinions in March 2011, and thus they did not review—and could not have reviewed—the LMC records from 2012 or any of Dr. Barnes' records that post-date March 2011. Their opinions are thus based on an incomplete record. What is more, these psychologists likely would not have reached the same opinions if they had reviewed all of the evidence from Dr. Barnes, given that they specifically relied on one of Dr. Barnes' opinions in reaching their conclusions and, correspondingly, deemed Dr. Barnes to be a credible source regarding Plaintiff's mental functional abilities (*see, e.g.,* tr. 436 (Dr. Heffron's reference to Dr. Barnes' statement of February 2011 that Plaintiff had no mental impairment that significantly interfered with daily functioning); tr. 440 (Dr. Thibodeau's affirming Dr. Heffron's PRTF its entirety)). Similarly, Dr. Barnes' more recent treatment notes strongly suggest he would have answered the question posed to him in February 2011 differently had it been posed to him again after his visits with Plaintiff in February 2012, May 2012, and beyond. Put simply, the opinions of Drs. Thibodeau and Heffron are not based upon a complete record and thus do not adequately address or assess Plaintiff's condition during the full relevant period.

---

[9] The ALJ accurately found that Dr. Barnes assessed no functional limitations, but this one finding is insufficient to outweigh the ALJ's other findings as to Dr. Barnes discussed herein.

Case No.: 5:14cv127/EMT

With respect to the LMC records, the ALJ correctly noted that Plaintiff's mental status examinations yielded essentially normal results. The undersigned concludes, however, that this factor alone is insufficient to support a finding that Plaintiff had no severe mental impairment or any associated functional limitations in light of the other evidence of record, including the treatment notes from the LMC. The LMC treatment notes reveal, in pertinent part, that Dr. Howard—a psychiatric specialist—assessed major depressive disorder and generalized anxiety disorder, referred Plaintiff for counseling, and assigned Plaintiff a GAF score of 51, which is the lowest possible score to remain in the "moderate" symptoms category, instead of the "serious" symptoms category (*see* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994) (a GAF score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job))). The undersigned is aware that a diagnosis, alone, is insufficient to establish the severity of an impairment. *See, e.g.*, McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986) ("the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality"); *see also* Salles v. Comm'r. of Soc. Sec. Admin., 229 F. App'x 140, 145 (3d Cir. 2007) (unpublished) (diagnoses alone, including diagnosis of depression, insufficient to establish severity at step two).[10] But here there are diagnoses from both Plaintiff's long-term treating physician and a specialist, each of whom also determined Plaintiff was in need of psychiatric counseling and medications. Such evidence goes beyond a mere diagnosis in the record. *See* Yuckert, 482 U.S. at 140–41 (the step-two inquiry is a *de minimis* screening device to dispose of groundless claims). Under other circumstances this court might find that a psychiatrist's unremarkable findings upon examination support a finding that a claimant's mental impairment is non-severe, but upon review of the record as a whole here, this court cannot conclude that such a factor is sufficient to uphold the ALJ's findings.

---

[10] Salles and any other unpublished case cited herein are cited only as persuasive authority. *See, e.g.*, United States v. Rosenthal, 763 F.2d 1291, 1294 n.4 (11th Cir. 1985) (citing an unpublished Seventh Circuit opinion as persuasive authority); *see also* U.S. Ct. of App. 11th Cir. Rule 36–2 (providing that an unpublished opinion may be cited as persuasive authority); Twin City Fire Ins. Co., Inc. v. Ohio Cas. Ins. Co., Inc., 480 F.3d 1254, 1260 n.3 (11th Cir. 2007) (citing R. 36–2 and noting that an unpublished opinion may be cited as persuasive authority).

Lastly, the ALJ's overall finding at step two as to Plaintiff's mental impairments appears to be based on a premise that Plaintiff had to demonstrate that by the time his application was decided he had *already* experienced twelve continuous months of disability to meet the duration requirement under the regulations. While that is one way to establish the duration requirement, there is another: the duration requirement may be met if the impairment "can be *expected* to last for a continuous period of not less than 12 months." *See, e.g.*, 42 U.S.C. § 423(d)(1)(A) (emphasis added); *see also* Social Security Ruling ("SSR") SSR 82–52 (eff. Aug. 20, 1980) ("When the application is being adjudicated (or a hearing decision is being issued) before the impairment has lasted 12 months, the nature of the impairment, the therapeutic history, and the prescribed treatment will serve as the basis for determining whether the impairment is expected to . . . continue to prevent the individual from engaging in any SGA (or any gainful activity) for the additional number of months needed to make up the required 12 months duration (e.g., 7 months for the claim being adjudicated in the 5th month, etc.)."); Charafeddine v. Astrue, No. 12-CV-00535-REB, 2013 WL 1232205, at *3 n.3 (D. Colo. Mar. 27, 2013) (a claimant need not prove that he was unable to engage in SGA "for a period of twelve continuous months prior to his date last insured, but only that []he became disabled on or before that date") (citing McQuestion v. Astrue, 629 F. Supp. 2d 887, 901–02 (E.D. Wis. 2009) and SSR 83-20 ("Although important to the establishment of a period of disability and to the payment of benefits, the expiration of insured status is not itself a consideration in determining when disability first began.")).

Here, the record arguably supports a finding that Plaintiff had developed a severe mental impairment in early 2012, which continued through May 2013. Thus, it matters not that Plaintiff did not seek "formal psychiatric treatment from a mental health specialist until July 11, 2012"; that Dr. Howard treated Plaintiff, diagnosed Plaintiff, and assessed GAF scores only over a one-month period in July and August 2012; or that "the[] [LMC] treatment records do not relate back to his alleged onset date," as the ALJ noted in finding Plaintiff's mental impairments non-severe. If Plaintiff had or developed a severe or disabling mental impairment during the relevant period which "could be expected to last for a continuous period of not less than 12 months," Plaintiff satisfied the duration requirement under the Act and regulations. *See, e.g.*, 42 U.S.C. § 423(d)(1)(A).

Accordingly, the ALJ erred at step two of the sequential analysis with respect to Plaintiff's mental impairments. Moreover, the error is not harmless because the ALJ failed to include any

mental limitations in the RFC or the hypothetical questions posed to the VE or otherwise consider Plaintiff's mental impairments at any subsequent step of the sequential analysis. *Cf.* Delia v. Comm'r of Soc. Sec. Admin., 433 F. App'x 885, 887 (11th Cir. 2011) (unpublished) (although ALJ erred in finding claimant's mental impairments non-severe, the error was harmless because the ALJ "gave full consideration to the consequences of Delia's mental impairments on his ability to work at later stages of the analysis") (citing Reeves v. Heckler, 734 F.2d 519, 524 (11th Cir. 1984) (rejecting a challenge to an ALJ's conclusion as harmless error when the ALJ had considered the relevant evidence in making the disability determination)).

In Social Security cases, the role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings, not to find facts. Because of this limited role, the general rule is to reverse and remand for additional proceedings when errors occur. *See, e.g.*, Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993) (referring to general practice); Holt v. Sullivan, 921 F.2d 1221, 1223–24 (11th Cir. 1991). A case may be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis, 985 F.2d at 534; *see also* Bowen v. Heckler, 748 F.2d 629, 636 (11th Cir. 1984) (if the Commissioner's decision is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the decision with or without remanding the case for a rehearing); Carnes, 936 F.2d at 1219 ("The record . . . is fully developed and there is no need to remand for additional evidence."); Elam, 921 F.2d at 1216–17 (finding that improperly refuted testimony of a treating physician must be accepted as true and remanding "with directions to enter a finding of total disability").

Here, the cumulative effect of the evidence does not establish disability without any doubt.[11]

---

[11] Indeed, the undersigned notes that Plaintiff's testimony at his hearing before the ALJ suggests that the Zoloft was controlling his symptoms (*see, e.g.*, tr. 73), even though Dr. Barnes' treatment notes suggest the opposite. The ALJ, however, did not identify Plaintiff's testimony as to the Zoloft as a basis for finding his mental impairments non-severe or for concluding that Plaintiff had no mental functional limitations, and it is not the role of this court to supply any such basis to support the ALJ's findings. *See, e.g.*, Allen v. Barnhart, 357 F.3d 1140, 1145–45 (10th Cir. 2004) (district courts should not draw factual conclusions on behalf of an ALJ or create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself) (citing SEC v. Chenery Corp., 318 U.S. 80 (1943)); Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991) ("It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence . . . "); Zblewski v. Schweiker, 732 F.2d 75, 78–79 (7th Cir. 1984) (while strong grounds may have existed for rejecting

Therefore, this case must be remanded for further administrative proceedings. Upon remand, the ALJ shall further develop the record regarding Plaintiff's mental impairments (for example, by obtaining updated PRTFs or other opinions that are based on a review of all of the relevant evidence of record and which address the existence, nature, and extent of any functional mental limitations, and by closely examining the efficacy of Plaintiff's medications).[12] If credible limitations are found to exist, they should be included in Plaintiff's RFC and presented to a VE, if applicable, or they should otherwise be considered in determining whether Plaintiff was able to work during the relevant period. Additionally, the ALJ shall specifically consider whether any of Plaintiff's impairments met the duration requirement, either because they had lasted or *could have been expected to last* for a continuous period of not less than twelve months.

VI.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is not supported by substantial evidence and should not be affirmed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. A remand for additional administrative proceedings is warranted.

Accordingly, it is **ORDERED**:

Pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, the Commissioner is ordered to remand this case to the Administrative Law Judge for further proceedings consistent with this order, and the Clerk is directed to close the file.

At Pensacola, Florida this 29th day of September 2015.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

---

claimant's testimony, ALJ's failure to articulate reasons for doing so precludes meaningful appellate review). The efficacy of Plaintiff's Zoloft, however, should be considered by the ALJ upon remand.

[12] In light of the undersigned's conclusion that the ALJ erred at step two, the court need not consider Plaintiff's remaining claims for relief, as the error at step two necessarily calls into question the ALJ's findings at the remaining steps of the sequential evaluation.